**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 21-cr-609-APM |
| | : | |
| v. | : | |
| | : | |
| JEREMY BROWN, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT JEREMY BROWN'S**
**MOTION FOR A BILL OF PARTICULARS**

Defendant Jeremy Brown moves under Federal Rule of Criminal Procedure 7(f) for a bill

of particulars. ECF No. 41. Whether a bill of particulars is appropriate lies within the Court's

"sound discretion." *United States v. Mejia*, 448 F.3d 436, 445 (D.C. Cir. 2006) (quotation omitted).

Exercising that discretion, this Court should deny the motion.

### PROCEDURAL BACKGROUND

On October 1, 2021, Defendant Brown was charged by Information (ECF No. 6) with two

misdemeanor offenses in relation to his alleged conduct at the United States Capitol on January 6,

2021: one count of entering and remaining in a restricted building or grounds, in violation of 18

U.S.C. § 1752(a)(1); and one count of disorderly and disruptive conduct in a restricted building or

grounds, in violation of 18 U.S.C. § 1752(a)(2).  Trial in this matter is scheduled to begin on March

4, 2024.  On November 27, 2023, Defendant Brown filed the instant motion for a bill of particulars.

### BRIEF FACTUAL BACKGROUND

The government anticipates that the evidence at trial will show that Defendant Brown left

his home in Florida on or about January 4, 2021, and traveled to Washington, D.C., in a caravan

of members and affiliates of a group called the "Oath Keepers."  Brown and other members of the

group brought firearms—including both handguns and rifles—which they deposited with an armed

"quick reaction force" that was staged in Virginia and prepared to bring those weapons into the District on January 6 if called upon by those on the ground inside the city.  On January 6, Brown met up with other Oath Keepers at the rally at the Ellipse.  There, Brown told a bystander who asked if the group were militia that they were the "Oath Keepers," and explained that the group "supports the Constitution and whoever follows it; right now there's only one: that would be Trump."

When the riot at the Capitol began to unfold, the leader of the Oath Keepers (Elmer Stewart Rhodes III) directed his followers to the Capitol.  Shortly thereafter, Brown—dressed in camouflage, a protective vest, a helmet, and protective glasses—marched to the Capitol and onto the restricted areas of the Capitol grounds with his fellow Oath Keepers.  Brown did not breach the building with other Oath Keepers, but while on the Capitol grounds, Brown positioned himself within the restricted area and at the front of several groups of rioters engaging with riot police.  For example, at about 4:25 p.m., when riot police officers attempted to clear the mob that had gathered near the northwest terrace area, Brown stood at the front of the mob, shouting at the officers to "do the right thing" and take off their helmets and join the rioters.  When the officers advanced in a line chanting, "Move back," and used their batons to push back the rioters, Brown did not comply; he only retreated when pushed with police baton sticks.  During this encounter, Brown repeatedly claimed that the officers were, in his opinion, violating the laws and the Constitution of the United States.  Brown told the officers, "We're not here to start any problems, man.  We're just here to redress our grievances."

Twenty minutes later, Brown was again at the front of a line of riot police officers now guarding an exterior staircase of the Capitol.  Brown took off his protective vest and held it up for the officers, stating, "This vest protected you."  Brown explained that he had served in the military

2

for 20 years.  Brown urged the officers, "Take off your helmets and join us."  When the officers did nothing in response, Brown and other members of the mob told the officers, "You should be ashamed of yourselves."

In the weeks prior to January 6, Brown and other members and affiliates of the Oath Keepers participated in group chats on an encrypted messaging application in which they discussed the need to stop the transfer of presidential power from former President Trump to President Biden by any means necessary, up to and including the use of force and violence.  On those chats, many echoed Rhodes' calls for President Trump to invoke a statute called "the Insurrection Act" to, among other things, activate the military, law enforcement, and militia to help him "'stop the steal' and defeat the coup."  On December 22, Brown wrote to an encrypted Florida Oath Keepers group chat, "Anyone advising AGAINST the Insurrection Act in the last phases of an Insurrection, IS THEMSELVES part of the Insurrection. PERIOD. Take notes."

On December 24, Florida Oath Keepers leader Kelly Meggs wrote to the same encrypted group chat (of which Brown was a participant), "It's gonna be a WILD time in DC; we gotta get the crowd going during the day; I think we get everyone up good and close to the Capitol bldg so they can here is inside; then at night well whatever happens happens."  The next day, Meggs wrote, "Time for a gut check from everyone in this room.  If this is our course where do you fit in. This is where we are, we have been invaded.  Patriots are going to stand and we have to lead them!"  When Florida Oath Keeper Graydon Young expressed his hope that their mission to D.C. would not be a "fool's errand," Oath Keeepers leader Rhodes jumped in to re-assure Young and the other Florida Oath Keepers that it would not be a fool's errand—that they would let President Trump know they would be willing to fight to help him to stay in power, and "if he fails to act, then we will.  He needs to understand that we will have no choice."

With this understanding about the group's intentions for January 6, Brown agreed to join the Oath Keepers in traveling to Washington, D.C., to participate in their operation. Brown participated in discussions on the encrypted group chats about the planning and logistics for carrying out these goals. For example, a few days before January 6, Brown wrote to one group chat:

> We have a RV an Van going. Plenty of Gun Ports left to fill. We can pick you up… If you can, come to my house anytime Saturday. You can stop by and drop stuff off, or stay the night. This way we can load plan, route plan, and conduct PCIs (Pre Combat Inspections). I would LIKE to depart by 0645 on Sunday morning, Jan 3rd. Push through to the NC linkup on the 3rd, RON (Rest Over Night) there, then push to DC on the 4th. This will give us the 4th/5th to set up, conduct route recons, CTR (Close Target Reconnaissance) and any link ups needed with DC elements.

During this same period, Kelly Meggs informed another Florida Oath Keeper, Caleb Berry, that Brown possessed explosives in his Recreational Vehicle ("RV"). Nine months later, on September 30, 2021, when Brown's residence and vehicles were searched pursuant to an authorized search warrant at the time of his arrest, the government seized two illegal short barrel firearms from Brown's residence and military ordinance grenades from Brown's RV—the same RV that Brown used to travel to Washington, D.C. on January 6.

## ARGUMENT

Brown's motion is styled as a request for a bill of particulars but is in fact a request for discovery and an outline of the evidence the government will introduce against him at trial. The former request has already been satisfied by the discovery the government has provided; the latter request is premature.

## I.    LEGAL STANDARD

A bill of particulars "ensure[s] that the charges brought against a defendant are stated with enough precision to allow the defendant to understand the charges, to prepare a defense, and

perhaps also to be protected against retrial on the same charges." *United States v. Butler*, 822 F.2d 1191, 1193 (D.C. 1987).  It is not required, however, if the indictment "is sufficiently specific, or if the requested information is available in some other form."  *Id.*; *see United States v. Lorenzana-Cordon*, 130 F. Supp. 3d 172, 179 (D.D.C. 2015) (denying motion for bill of particulars and noting that the government had provided extensive discovery that "allows Defendants to adequately prepare for trial").

Further, a bill of particulars "is not a discovery tool or a device for allowing the defense to preview the government's theories or evidence."  *United States v. Ramirez*, 54 F. Supp. 2d 25, 29 (D.D.C. 1999); *see also United States v. Brodie*, 326 F. Supp. 2d 83, 91 (D.D.C. 2004) (same). Rather, a bill of particulars "is intended to give the defendant only that minimum amount of information necessary to permit the defendant to conduct his *own* investigation and not to provide the defendant with the fruit of the government's investigation."  *United States v. Sanford Ltd.*, 841 F. Supp. 2d 309, 316 (D.D.C. 2012) (internal quotation marks and citation omitted, emphasis in original).  Therefore, a bill of particulars "properly includes clarification of the indictment, not the government's proof of its case."  *United States v. Martinez*, 764 F. Supp. 2d 166, 173 (D.D.C. 2011) (internal quotation marks and citation omitted); *United States v. Savoy*, 889 F. Supp. 2d 78, 115 (D.D.C. 2012) (same); *see also United States v. Taylor*, 17 F. Supp. 3d 162, 178 (E.D.N.Y. 2014) (bill of particulars "may not be used by the defense as a fishing expedition or to force the government to reveal all its evidence before trial").

Applying this principle, judges of this Court have consistently denied motions for a bill of particulars where the motion seeks details about the nature of the government's evidence.  Thus, for example, in *United States v. Han*, 280 F. Supp. 3d 144, 149 (D.D.C. 2017), the Court denied a motion for a bill of particulars requesting information about the basis for fraud and tax charges

against the defendant, including the precise representations allegedly made by the defendant and the amount of taxes allegedly owed.  The Court explained that the requested information had already been provided to the defendant in discovery and elsewhere, and a "bill of particulars is meant to allow a defendant to properly prepare for trial, not provide a method to force the prosecution to connect every dot in its case." *Id.*

Similarly, in *Brodie*, the court denied a motion for a bill of particulars requesting "the circumstances surrounding the alleged acts" of fraud committed by the defendants as well as "other evidentiary details."  326 F. Supp. 2d at 92.  The court reasoned that the charges set forth in the indictment were "detailed and alleged with particularity" and "the discovery provided by the government has been voluminous," and therefore there was "no reason for any further particularization of the overt acts." *Id.*

So, too, did this Court observe, in denying a prior motion for a bill of particulars in a related case:  "By the time Defendant is tried, he will have had received extensive discovery and the benefit of at least two prior trials in which the government has presented evidence against indicted co-conspirators who are charged with similar offenses." *See U.S. v. Crowl, et al.*, No. 21-cr-28, ECF No. 811 at 5.

## II.    THE DEFENDANT IS NOT ENTITLED TO A BILL OF PARTICULARS

The Court should deny the defendant's motion for a bill of particulars for two main reasons. First, the Information provides sufficient detail regarding the allegations against the defendant. *See Mejia*, 448 F.3d at 445 (no bill of particulars required where the superseding indictment identified, among other things, the object of the charged conspiracy, the conspiracy's "time period," the applicable *mens rea*, and locations where conspirators acted). The Information in this case spells the time and place where Brown is alleged to have unlawfully entered and remained in a restricted

building or grounds and engaged in disorderly and disruptive conduct.  ECF No. 6.  These are not complicated charges.  The Indictment is sufficient and precise enough for the "defendant to understand the charges" and "prepare a defense." *Butler*, 822 F.2d at 1193.

Second, the defendant's motion largely requests information that falls outside the scope and purpose of a bill of particulars.  The third through fifth requests in the defendant's motion constitute discovery requests.  The evidence defendant seeks through these requests is already "available in some other form." *Butler*, 822 F.2d at 1193.  The full discovery provided in this case and the discovery and trial exhibits from the related cases of *U.S. v. Rhodes, et al.* (No. 22-cr-15-APM) and *U.S. v. Crowl, et al.* (21-cr-28-APM) – all of which are available to the defendant through the discovery provided to his counsel – contain voluminous information about the allegations.  Like in *Brodie*, therefore, the extensive information available through discovery abolishes the "reason for any further particularization of the overt acts."  326 F. Supp. 2d at 92.

With respect to the first, second, sixth, and seventh requests in the defendant's motion, these seek an outline of the evidence that the government will present at trial.  "A bill of particulars is meant to allow a defendant to properly prepare for trial, not provide a method to force the prosecution to connect every dot in its case." *Han*, 280 F. Supp. at 149.  Moreover, undersigned counsel has already met with Brown's counsel in a reverse proffer session and highlighted the main evidence the government will present at trial.  The government also plans to provide the defense with its exhibits well in advance of trial (and, as noted above, has already provided a copy of all of the exhibits introduced in the prior four trials of the related cases).

For all these reasons, the defendant's motion for a bill of particulars should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:      /s/
Kathryn L. Rakoczy
Assistant United States Attorney
D.C. Bar No. 994559
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530