**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 21-cr-609-APM** |
| | : | |
| **v.** | : | |
| | : | |
| **JEREMY BROWN,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S NOTICE PURSUANT**</u>
<u>**TO FEDERAL RULE OF EVIDENCE 404(b)**</u>

Defendant Jeremy Brown stands charged by Information (ECF No. 6) with two misdemeanor offenses in relation to his alleged conduct at the United States Capitol on January 6, 2021: one count of entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); and one count of disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2).  Trial in this matter is scheduled to begin on March 4, 2024.  The government respectfully submits this notice of its intent to introduce two main categories of evidence outside of the evidence of Brown's conduct on January 6:  (1) statements by Brown and other members and affiliates of the Oath Keepers that reflected an intent to forcibly oppose the results of the election; and (2) evidence that Brown and certain other members and affiliates of the Oath Keepers transported weapons to the Washington, D.C., area for January 6. Such evidence is directly relevant to Brown's intent when he entered the restricted areas of the Capitol grounds on January 6.  As such, it is intrinsic evidence of the offenses charged.  In the alternative, it is "other acts" evidence that is admissible to prove Brown's motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident.

## BACKGROUND

The government anticipates that the evidence at trial will show that Defendant Brown left

his home in Florida on or about January 4, 2021, and traveled to Washington, D.C., in a caravan of members and affiliates of a group called the "Oath Keepers." On January 6, Brown met up with other Oath Keepers at the rally at the Ellipse. There, Brown told a bystander who asked if the group were militia that they were the "Oath Keepers," and explained that the group "supports the Constitution and whoever follows it; right now, there's only one: that would be Trump."

When the riot at the Capitol began to unfold, the leader of the Oath Keepers (Elmer Stewart Rhodes III) directed his followers to the Capitol. Shortly thereafter, Brown—dressed in camouflage, a protective vest, a helmet, and protective glasses—marched to the Capitol and into the restricted areas of the Capitol grounds with his fellow Oath Keepers. Brown did not breach the building with other Oath Keepers, but while on the Capitol grounds, Brown positioned himself within the restricted area and at the front of several groups of rioters engaging with riot police. For example, at about 4:25 p.m., when riot police officers attempted to clear the mob that had gathered near the northwest terrace area, Brown stood at the front of the mob, shouting at the officers to "do the right thing" and take off their helmets and join the rioters. When the officers advanced in a line chanting, "Move back," and used their batons to push back the rioters, Brown did not comply; he only retreated when pushed with police baton sticks. During this encounter, Brown repeatedly claimed that the officers were, in his opinion, violating the laws and the Constitution of the United States. Brown told the officers, "We're not here to start any problems, man. We're just here to redress our grievances."

Twenty minutes later, Brown was again at the front of a line of riot police officers now guarding an exterior staircase of the Capitol. Brown took off his protective vest and held it up for the officers, stating, "This vest protected you." Brown explained that he had served in the military for 20 years. Brown urged the officers, "Take off your helmets and join us." When the officers

2

did nothing in response, Brown and other members of the mob told the officers, "You should be ashamed of yourselves."

Brown's actions on January 6 were the culmination of weeks of discussions with the Florida Oath Keepers about the need to forcibly oppose the situation in the United States following the 2020 presidential election, which Brown described as a "Marxist/Color Revolution." Within days of the election, on November 8, 2020, Brown joined an encrypted group chat of Florida Oath Keepers. In joining the chat, Brown posted, "I look forward to getting read on as quickly as possible. Seems we have a bit of a situation...lol." Brown's messages in the following days suggested that he felt the Oath Keepers needed to prepare to be the "Defense Force for the Republic." He cautioned the group, "As I am sure you all have plenty of ammo and guns. What I suspect we are not deep on are burner phones and phone cards. These will be needed in great numbers as part of a clandestine comms plan." Brown continued, "In the movies they throw them away. In a guerrilla war we rotate them. They will be too hard to come by when the SHTF. Pay cash if possible as this is a flagged item." Brown also noted, "[I]f your 'supplies' are ALL located in your residence, break them up and prepo in numerous locations."

In late November, Brown led a training for other Oath Keeper members and affiliates on the topic of "unconventional warfare." During that training, Brown showed a timeline of "Activities of an Insurgency or Resistance Movement," and told the audience that he believed they were at the last steps before an insurgency goes overt (*i.e.*, the stage of "increased political violence, terror, and sabotage," and "shadow governance activities"). On the Florida Oath Keepers' encrypted group chats, Brown echoed Rhodes' calls for President Trump to invoke a statute called "the Insurrection Act" to, among other things, activate the military, law enforcement, and militia to help him "'stop the steal' and defeat the coup." On December 22, Brown wrote to

the Florida Oath Keepers group chat, "Anyone advising AGAINST the Insurrection Act in the last phases of an Insurrection, IS THEMSELVES part of the Insurrection. PERIOD. Take notes."

In December 2020, Brown and the other participants of the Florida Oath Keepers' encrypted group chats began to focus more directly on January 6 as a day of action. On December 19—the day that then-President Trump tweeted, "Big protest in D.C. on January 6th. Be there, will be wild!"—Brown posted to the Florida Oath Keepers' encrypted group chat, "I think he wants us at Congress, as that is the day they count the EC Votes [presumably a reference to the Electoral College]. Plenty of time to plan." On December 24, Florida Oath Keepers leader Kelly Meggs wrote to the same encrypted group chat (of which Brown was a participant), "It's gonna be a WILD time in DC; we gotta get the crowd going during the day; I think we get everyone up good and close to the Capitol bldg so they can here is inside; then at night well whatever happens happens." The next day, Meggs wrote, "Time for a gut check from everyone in this room. If this is our course where do you fit in. This is where we are, we have been invaded. Patriots are going to stand and we have to lead them!" When Florida Oath Keeper Graydon Young expressed his hope that their mission to D.C. would not be a "fool's errand," Oath Keeepers leader Rhodes jumped in to re-assure Young and the other Florida Oath Keepers that it would not be a fool's errand—that they would let President Trump know they would be willing to fight to help him to stay in power, and "if he fails to act, then we will. He needs to understand that we will have no choice."

With this understanding about the group's intentions for January 6, Brown agreed to join the Oath Keepers in traveling to Washington, D.C., and to be part of their operation. Brown participated in discussions on the encrypted group chats about the planning and logistics for carrying out these goals. Part of this planning included the organizing of an armed "quick reaction force" ("QRF") that would be staged in Virginia and prepared to bring those weapons into the

District on January 6 if called upon by those on the ground inside the city.  Brown offered to transport other Oath Keepers and their weapons to the QRF, writing to one of the Florida group chats:

> We have a RV an Van going.   Plenty of Gun Ports left to fill.   We can pick you up… If you can, come to my house anytime Saturday.   You can stop by and drop stuff off, or stay the night.   This way we can load plan, route plan, and conduct PCIs (Pre Combat Inspections).   I would LIKE to depart by 0645 on Sunday morning, Jan 3rd.  Push through to the NC linkup on the 3rd, RON (Rest Over Night) there, then push to DC on the 4th.   This will give us the 4th/5th to set up, conduct route recons, CTR (Close Target Reconnaissance) and any link ups needed with DC elements.

During this same period, Kelly Meggs informed another Florida Oath Keeper, Caleb Berry,[1] that Brown possessed explosives in his Recreational Vehicle ("RV").  Nine months later, on September 30, 2021, when Brown's residence and vehicles were searched pursuant to an authorized search warrant at the time of his arrest, the government seized two illegal short barrel firearms from Brown's residence and military ordinance grenades from Brown's RV—the same RV that Brown used to travel to Washington, D.C. on January 6.

On January 4, Brown and other members and affiliates of the Florida Oath Keepers caravanned up to D.C.  The group, including Brown, brought firearms—including both handguns and rifles—which they deposited with the QRF at a hotel in Arlington, Virginia, on January 5. They also brought additional gear like ballistics vests, helmets, goggles, scissors, knives.

On January 6, as members of the group—including Brown—breached the Capitol grounds, and some breached the building, a leader of the QRF posted to the group chats, "QRF standing

---

[1] Because of this Court's ruling in the related case of *United States v. Parker, et al.*, 21-cr-28 (APM), finding this statement to constitute inadmissible hearsay against defendants not on trial with co-conspirator Kelly Meggs, the government will only seek to introduce evidence of this statement if Defendant Brown should testify.

by."  Fortunately, the QRF was not called into action that day, although Rhodes would later lament that his "only regret" was that the group "should have brought rifles."

## ARGUMENT

The two categories of proffered evidence—(1) the statements by Brown and the Oath Keeper members and affiliates with whom he planned and traveled to D.C. for the events of January 6, and (2) the evidence that Brown and these Oath Keeper members and affiliates brought weapons which they staged with an armed QRF—are directly relevant to Brown's intent when he entered and remained in the restricted area of the Capitol grounds on January 6.  As such, they are intrinsic evidence of the offenses charged.  They are also evidence of Brown's motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident, and are thus also admissible pursuant to Rule 404(b).

## I.    LEGAL STANDARD

"Rule 404(b) excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.'"  *United States v. Allen*, 960 F.2d 1055, 1058 (D.C. Cir. 1992) ("[The evidence] was an intrinsic part of the witness' account of the circumstances surrounding the offense for which [defendant] was indicted (and also was relevant both to [defendant's] intent to distribute and his knowledge about [a co-conspirator's] drug cache."); *see also United States v. Miller*, 799 F.3d 1097, 1105 (D.C. Cir. 2015) ("The Rule does not bar 'evidence . . . of an act that is part of the charged offense.'"); *United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010) ("No [404(b)] notice is required, however, for evidence of an 'intrinsic act,' that is, an act that is 'part of the crime charged.'"); *United States v. Gartmon*, 146 F.3d 1015, 1020 (D.C. Cir. 1998) (evidence that defendant charged with fraud had threatened a co-conspirator not "other crime evidence" but instead "inextricably intertwined" with charged

offense); *United States v. Washington*, 12 F.3d 1128, 1135 (D.C. Cir. 1994) ("Moreover, 'Rule 404(b) excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.'"); Fed. R. Evid. 404(b), Advisory Comm. Note regarding 1991 Amendment ("The amendment does not extend to evidence of acts which are 'intrinsic' to the charged offense."); *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000) ("[U]ncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime," thus taking such acts outside the scope of Rule 404(b).)[2]

Evidence subject to Federal Rule of Evidence 404(b) is nevertheless still admissible. The Federal Rules of Evidence simply prohibit "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). As the Court of Appeals has reiterated, however:

> Although stated as a restriction, the Rule is actually one of "inclusion rather than exclusion." *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000). Evidence is only prohibited if it is offered for the impermissible inference that a defendant is of bad character resulting in bad conduct. *See, e.g., United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990). Thus evidence of a defendant's prior bad acts is admissible for purposes *unrelated* to the defendant's character or propensity to commit crime, such as "proof of motive, opportunity, intent,

---

[2] It should be noted that *Bowie,* 232 F.3d 923 seems to have questioned the admission of intrinsic other crimes evidence without a 404(b) analysis, but one panel of the Circuit cannot overrule standing precedent. *See, e.g., United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) ("panels of this court [] are obligated to follow controlling circuit precedent until either [the Court of Appeals] sitting *en banc*, or the Supreme Court, overrule it."); *see also United States v. Alexander*, 331 F.3d 116, 125-26 (D.C. Cir. 2003) ("Although we have recently expressed our dissatisfaction with the extrinsic-intrinsic distinction . . . we have nonetheless recognized that at least in a narrow range of circumstances ... evidence can be 'intrinsic to' the charged crime"). In any event, the *Bowie* court recognized that its position does not affect the admissibility of the evidence: the "only consequences of labeling evidence 'intrinsic' are to relieve the prosecution of Rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction upon the defense counsel's request." *Id.* at 927.

> preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.
> R. Evid. 404(b); *see also Miller*, 895 F.2d at 1436 ("[U]nder Rule 404(b), *any*
> purpose for which bad-acts evidence is introduced is a proper purpose so long as
> the evidence is not offered solely to prove character.").

*United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002) (emphasis in original).  The Rule's

list of permissible uses of bad-act evidence is illustrative, not exhaustive.    2 J. Weinstein and M.

Berger, WEINSTEIN'S FEDERAL EVIDENCE § 404.22[6][a] (2017); *see, e.g., Bowie*, 232 F.3d

at 933 (approving admission of other crimes evidence to corroborate other evidence).  The D.C.

Circuit has held that Rule 404(b) is "quite permissive, excluding evidence only if it is offered for

the sole purpose of proving that a person's actions conformed to his or her character." *United*

*States v. Long*, 328 F.3d 655, 660-61 (D.C. Cir. 2003) (quotations and citations omitted); *see also*

*United States v. Loza*, 764 F. Supp. 2d 55, 57 (D.D.C. 2011) (citing *Mahdi*, 598 F.3d at 891); *United*

*States v. Pettiford*, 517 F.3d 584, 588 (D.C. Cir. 2008); *Miller*, 895 F.2d at 1436.

Analysis of the admissibility of bad acts evidence involves two steps.  First, the Court

determines "whether the evidence is probative of some issue other than character." *Cassell*, 292

F.3d at 792.  Evidence of other crimes is admissible if it "is relevant, relates to something other

than character or propensity, and supports a jury finding that the defendant committed the other

crime or act." *Id.* (citing *Bowie*, 232 F.3d at 926-27); *see also Huddleston v. United States*, 485

U.S. 681, 685 (1988).  "Only one series of evidential hypotheses is forbidden in criminal cases

by Rule 404: a man who commits a crime probably has a defect of character; a man with such a

defect of character is more likely than men generally to have committed the act in question."

*United States v. Moore*, 732 F.2d 983, 987 n.30 (D.C. Cir. 1984).  Second, the court must decide

if the evidence should be excluded under Rule 403 of the Federal Rules of Evidence, *United States*

*v. Clarke*, 24 F.3d 257, 264 (D.C. Cir. 1994), which precludes evidence only if "its probative value

is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading

the jury, undue delay, wasting time, or needlessly cumulative evidence," Fed. R. Evid. 403. "[T]he test under 403 is 'unfair prejudice,' not just any prejudice or harm to the defense." *United States v. Sitzmann*, 856 F. Supp. 2d 55, 61-62 (D.D.C. 2012).

Notably, other crimes evidence is often relevant to several issues.   In its *en banc* decision in *Crowder*, the Court of Appeals stated the following:

> Rule 404(b) evidence will often have such multiple utility, showing at once intent, knowledge, motive, preparation and the like.   Proof of an individual's intent to commit an act may itself serve as proof that the individual committed the act, as the Supreme Court recognized more than a century ago.   In proving that a defendant intended to distribute crack cocaine, for instance, the government might simultaneously be showing the defendant's motive to possess the crack, which Rule 404(b) permits.   Intent would thereby serve as an intermediate fact from which the jury could infer another intermediate fact ─motive─ from which it could in turn infer the element of possession.   Thus, other-offense evidence of intent would have probative value not just on the intent element, but also on the possession element of the offense.

*Crowder*, 141 F.3d at 1208 (citation omitted). Thus, in *Crowder*, other crimes evidence was admitted to show the defendant's knowledge, intent, and motive.  And these admissible other acts may occur before or after the charged offense. *See, e.g., United States v. Watson*, 894 F.2d 1345, 1349 (D.C. Cir. 1990) (admitting other crimes that occurred three months after charged offense); *United States v. Bibo-Rodriguez*, 922 F.2d 1398, 1400 (9th Cir. 1991) ("By it its very terms, 404(b) does not distinguish between 'prior' and 'subsequent' acts"); *United States v. Johnson*, 934 F.2d 936, 940 (8th Cir. 1991) ("the mere subsequency of an act . . . does not on that ground alone make it incompetent").

## II.    THE PROFFERED EVIDENCE IS DIRECTLY RELEVANT AND ADMISSIBLE TO PROVE THE OFFENSES CHARGED

Evidence that Brown and other Oath Keeper members and affiliates (1) made statements suggesting that they saw the 2020 presidential election results as the beginning of a revolution and believed they needed to become a militarized force to oppose the election results, and (2) organized

and contributed weapons to an armed QRF to support their January 6 operation in furtherance of these plans, is directly relevant to the issue of Brown's intent when he entered and remained in the restricted areas of the Capitol grounds on January 6.

A violation of 18 U.S.C. § 1752(a)(1) requires the government to prove, among other elements, that the defendant "knowingly" entered or remained in a restricted building or grounds without lawful authority to do so.  18 U.S.C. § 1752(a)(1); *United States v. Jabr*, 4 F.4th 97, 101 (D.C. Cir. 2021).  A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident.  *See Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005) ("[K]nowledge" and "knowingly" are normally associated with awareness, understanding, or consciousness."); *see also jury instructions delivered in other January 6 cases, e.g.*, *United States v. Parker, et al.*, 21-cr-28 (APM) (ECF No. 916 at 32); *United States v. Eicher*, 22-cr-38 (BAH) (ECF No. 82 at 6); *United States v. Lesperance, et al.*, 21-cr-575 (JDB) (ECF No. 96 at 26); *United States v. Chwiesiuk, et al.*, 21-cr-536 (ACR) (ECF No. 103 at 8-9); *United States v. Gietzen*, 22-cr-116 (CJN) (ECF No. 50 at 30).[3]

---

[3] While not directly pertinent to the issues raised by the instant motion, the government notes that there has been some disagreement among judges in this district as to whether the "knowingly" element of this statute requires knowledge by the defendant that he was entering an area where the vice president was temporarily visiting.  Two judges have held that it does.  *See United States v. Groseclose*, 21-cr-311 (CRC) (ECF No. 99); *United States v. Bingert, et al.*, 21-cr-91 (RCL) (ECF No. 166).  Many other judges, however, have held to the contrary.  *See, e.g., United States v. Eicher*, 22-cr-38 (BAH) (ECF No. 83 at 1) (responding to jury notes); *United States v. Samsel, et. al*, 21-cr-537 (Minute Order of Nov. 2, 2023).  As cited above, this Court's jury instructions on this offense in other cases did not include a requirement of knowledge that the vice president was temporarily visiting the Capitol on January 6.  As will be discussed in greater detail at the time of proposing jury instructions in this matter, the government submits that the "knowingly" *mens rea* requirement of 1752 violations does not require knowledge of the reason why the building/grounds were restricted.  "[T]he word 'knowingly' does not necessarily apply to every word in a long statutory phrase, such that questions may reasonably arise about how far into the statute the modifier extends'" *United States v. Collazo*, 982 F.3d 596, 610-612 (9th Cir. 2020) (en banc) (citing several Supreme Court cases on the tools of statutory interpretation).

A violation of § 1752(a)(2) requires that the government prove, among other elements, that the defendant acted "knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions." *See jury instructions delivered in other January 6 cases, e.g.*, *United States v. Eicher*, 22-cr-38 (BAH) (ECF No. 82 at 6-7); *United States v. Lesperance, et al.*, 21-cr-575 (JDB) (ECF No. 96 at 27); *United States v. Chwiesiuk, et al.*, 21-cr-536 (ACR) (ECF No. 103 at 9); *United States v. Gietzen*, 22-cr-116 (CJN) (ECF No. 50 at 32); *United States v. Horn*, 21-cr-301 (TJK) (ECF No. 82 at 13).

Evidence that Brown and the Oath Keeper members and affiliates with whom he came to D.C. made statements about becoming a militarized force to oppose the results of the election and then made preparations to do so by planning and contributing weapons to an armed QRF in support of their January 6 operation is evidence that they knowingly entered and remained in a restricted area when they breached the Capitol grounds on January 6, and that they did so with the intent to impede or disrupt the orderly conduct of Government business or official functions. As evidence of one or more elements of each of the charged offenses, this evidence is intrinsic and admissible. It is also evidence of Brown's motive, intent, preparation, plan, knowledge, absence of mistake, and lack of accident with respect to his conduct on January 6, and is thus also admissible pursuant to Rule 404(b). *See Cassell*, 292 F.3d at 792 (evidence of a prior bad act is admissible to prove motive and intent).

In the related case against Rhodes, Kelly Meggs, and other leaders of the Oath Keepers' January 6 operation, this Court did not find this evidence to be intrinsic to the charged offenses but did find it nonetheless admissible under Rule 404(b). 22-cr-15 8/30/22 Tr. at 32-35. As this Court held, Brown's transportation of firearms and explosives to the Washington, D.C., area on January 6 and, his and others' knowledge about the armed QRF, were directly relevant to the co-

conspirators' intent, preparation, knowledge, and planning. Here, where Brown is the charged defendant, and the government seeks to introduce evidence of Brown's statements and his contributions to the armed QRF against him to show his intent, it is much more clear that this evidence is intrinsic to the offenses charged.

Finally, the two categories of evidence proffered herein are relevant to rebut anticipated defenses. In the FRE 404(b) calculus, facts of consequence include facts that are relevant to reasonably anticipated defenses. *See United States v. Douglas*, 482 F.3d 591, 597-600 (D.C. Cir. 2007) (evidence of a prior arrest for possession of crack cocaine with intent to distribute was relevant and admissible to establish knowledge and intent in a prosecution for intent to distribute crack cocaine, even though the defendant did not dispute elements of knowledge and intent, because the evidence made it more probable that he knew the substance he was charged with possessing was crack cocaine; and the government bore the burden of proving intent beyond a reasonable doubt); *see also United States v. Roberson*, 581 F.Supp.3d 65, 75 (D.D.C. 2022) (admitting other acts evidence as highly probative of rebutting a defendant's denial). "'Federal courts repeatedly have held that the government may offer evidence in its case-in-chief in anticipation of an expected aspect of the defense.'" *Id.*, (citing *United States v. Curtin*, 489 F.3d 935, 940 (9th Cir. 2007)).

Here, the government anticipates the defendant will claim that he did *not* act knowingly—that he went to the Capitol grounds as part of a security detail and accidentally wound up in restricted areas. Evidence of the background of how Brown came to be in that location at that moment—including the statements he made in the weeks prior, and his planning for the armed QRF to support the Oath Keepers' January 6 operation—undermines this defense.

**CONCLUSION**

For all these reasons, the government submits that the categories of evidence described herein are relevant and admissible, and the government should be permitted to introduce such evidence at trial.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By: _____

Kathryn L. Rakoczy
Assistant United States Attorney
D.C. Bar Number 994559
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530