AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 21-sc-3138 |
| THE MONITORING OF GLOBAL POSITIONING SYSTEM INFORMATION | ) | |
| AND CELL SITE LOCATION DATA FOR ONE VERIZON CELL PHONE | ) | |
| AND SEARCH OF INFORMATION ASSOCIATED WITH THE SAME | ) | |
| NUMBER IN VIOLATION OF 18 U.S.C. § 1752(a)(1) | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Affidavit in Support of Application for Search Warrant. To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the requested warrant will also function as a pen register order. An attorney for the government has certified that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the Federal Bureau of Investigation See 18 U.S.C. §§ 3122(b), 3123(b).

located in the _____ District of _____New Jersey_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371 (conspiracy); 231(a)(2) (transport of firearms or explosives for use in civil disorder); 844(a)(2) (transportation of explosives) and 1752(a) (1) and (2) (unlawful entry on restricted buildings or grounds). | |

The application is based on these facts:

See attached Affidavit (incorporated by reference).

☐ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Katie M. Hill*

*Applicant's signature*

Katie Hill, Special Agent, FBI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Zia M. Faruqui
2021.09.29 19:41:24 -04'00'

Date: ____09/29/2021____

*Judge's signature*

City and state: __Washington, D.C.__                Zia M. Faruqui, U.S. Magistrate Judge

*Printed name and title*

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. 21-sc-3138 |
| THE MONITORING OF GLOBAL POSITIONING SYSTEM INFORMATION AND CELL SITE LOCATION DATA FOR ONE VERIZON CELL PHONE AND SEARCH OF INFORMATION ASSOCIATED WITH THE SAME NUMBER IN VIOLATION OF 18 U.S.C. § 1752(a)(1) | ) ) ) ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ New Jersey _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference). This court has authority to issue this warrant under 18 U.S.C. §§ 2703 (c)(1)(A), and 2711(3)(A). Because the government has satisfied the requirements of 18 U.S.C. § 3122, this warrant also constitutes an order under 18 U.S.C. § 3123.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

**YOU ARE COMMANDED** to execute this warrant on or before _____October 8, 2021_____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Zia M. Faruqui, U.S. Magistrate Judge_____.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☑ for __30__ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: __09/29/2021__

Zia M. Faruqui
2021.09.29 19:41:52 -04'00'

*Judge's signature*

City and state: __Washington, D.C.__

Zia M. Faruqui, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 21-sc-3138 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A-1

### Property to Be Searched

1.      This warrant applies to records and information associated with the cellular device assigned to call number ███████ ███ ("TARGET PHONE NUMBER"), used by JEREMY BROWN, whose service provider is VERIZON ("PROVIDER"), a wireless communications service provider that is located at 180 Washington Valley Road, Bedminster, New Jersey 07921.  The owner of the phone number is, at this time, unknown to law enforcement.

2.      Information about the location of the TARGET PHONE NUMBER that is within the possession, custody, or control of PROVIDER, including information about the location of the cellular telephone if it is subsequently assigned a different number.

**ATTACHMENT A-2**

1.      The subject of this investigation is JEREMY BROWN.

**ATTACHMENT B-1**

### I.    Information to Be Disclosed by Provider

All information about the location of the TARGET PHONE NUMBER described in Attachment A-1 for a period of 30 days, during all times day or night.  "Information about the location of the target telephone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A-1.  It further includes:

- Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

- Source and destination telephone numbers;

- Date, time, and duration of communication; and

- All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the TARGET PHONE will connect at the beginning and end of each communication, as well as per-call measurements data (also known as PCMD, RTT, NELOSE, TrueCall or similar).

It also includes monitoring non-content signaling and routing information, including all non-content packet switched data, through the installation and use of a pen register and trap and trace device pursuant to 18 U.S.C § 3123 by the service provider and the Federal Bureau pf Investigation.  The pen register / trap and trace device shall be transferable to any change dialed number subsequently assigned to a device bearing the same ESN, IMSI or SIM as the target cell phone; any changed ESN, IMSI or SIM subsequently assigned the same dialed number as the target

3

cell phone; or any additional changed dialed number, ESN, IMSI or SIM listed to the same subscriber account as the target cell phone.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of PROVIDER, PROVIDER is required to disclose the Location Information to the government.  In addition, PROVIDER must furnish the government all information, facility, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with PROVIDER's services, including by initiating a signal to determine the location of the target telephone on PROVIDER's network or with such other reference points as may be reasonably available and at such intervals and times directed by the government.  The government shall compensate PROVIDER for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

## II.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section I. That information that is within the scope of Section I may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section I and will not further review the information absent an

order of the Court. Such sealed information may include retaining a digital copy of all

information received pursuant to the warrant to be used for authentication at trial, as needed.

**Attachment B-2**

**Particular Things to be Seized**

I.      **Government procedures for warrant execution**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose to the government the following information pertaining to the Account/TARGET PHONE NUMBER listed in Attachment A-1:

    a.  The following information about the customers or subscribers associated with the TARGET PHONE NUMBER/Account for the time period November 7, 2020 to January 20, 2021.

        i.  Names (including subscriber names, user names, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.  Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

   viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records, and

    ix.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the TARGET PHONE NUMBER/Account, including:

      A.  the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

      B.  information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

      C.  all available Mobile Data Session and IPv6 reports and any other location information, including "distance to tower" information or Timing Advance Information or Verizon's TrueCall report.

## II.    **Information to be Seized by the Government**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 USC 371 (conspiracy); 18 USC 231(a)(2) (transport of firearms or explosives for use in civil disorder); 18 USC 844(a)(2) (transportation of explosives) and 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds) (the "Subject Offenses") during the period November 7, 2020 to January 20, 2021.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section I and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF THE MONITORING OF GLOBAL POSITIONING SYSTEM INFORMATION AND CELL SITE LOCATION DATA FOR ONE VERIZON CELL PHONE AND SEARCH OF INFORMATION ASSOCIATED WITH THE SAME NUMBER IN VIOLATION OF 18 U.S.C. § 1752(a)(1)** | Case No. 21-sc-3138<br><br>**<u>Filed Under Seal</u>** |

*Reference:*     *USAO Ref.* # 2021R00494*; Subject Account(s):* ████████

**AFFIDAVIT IN SUPPORT OF
<u>AN APPLICATION FOR A SEARCH WARRANT</u>**

I, Katie Hill, being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.     I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41, 18 U.S.C. §§ 2703(a), and 2703(c)(1)(A), and former Chief Judge Hogan's Memorandum Opinion in In the Matter of the Application of the United States for an Order Authorizing the Monitoring of Geolocation and Cell Site Data for a Sprint Spectrum Cell Phone Number ESN, 2006 WL 6217584 at *4 (D.D.C. 2006) (Hogan, C.J.) ("Hogan Opinion"), for information about 1) the prospective location of the cellular telephone assigned call number ████████, (hereinafter referred to as the "TARGET PHONE NUMBER"), as detailed in Attachment B-1; and 2) historic location data for the TARGET PHONE NUMBER, as detailed in Attachment B-2[1], whose service provider is VERIZON ("PROVIDER"), a wireless telephone service provider headquartered at 180 Washington Valley

---

[1] Upon receipt of the information described in Section I of Attachment B-2, government-authorized persons will review the information to locate items described in Section II of Attachment B-2.

Road, Bedminster, New Jersey 07921.  As a provider of wireless communications service, PROVIDER is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  See 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  See 18 U.S.C. § 3123(b)(1).  A certification by Special Assistant United States Attorney Louis Manzo, an attorney for the government, that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the Federal Bureau of Investigations, is included on the signature page of this affidavit.

3.      Your affiant is a Special Agent with the Federal Bureau of Investigation ("FBI"), and, as such, am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). Your affiant joined the FBI as a Special Agent in August 2009. Your affiant is currently assigned to the FBI's Tampa Division Joint Terrorism Task force ("JTTF"). Your affiant's official duties include, but are not limited to, investigating individuals and groups who have committed violations of federal laws, including federal laws related to threats, international terrorism, and domestic terrorism. As a special agent, your affiant has participated in numerous investigations and have executed both arrest and search warrants. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely

2

that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 USC 371 (conspiracy); 18 USC 231(a)(2) (transport of firearms or explosives for use in civil disorder); 18 USC 844(a)(2) (transportation of explosives) and 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds) (the "Subject Offenses") have been committed by JEREMY BROWN and/or other identified and unidentified persons. There is also probable cause to believe that the historical location information, as described in Attachment B-2, and that the prospective location information, as described in Attachment B-1, will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses or evidence of the commission of these offenses. Moreover, the prospective location information described in Attachment B-1 will provide evidence of where the phone is currently located, and there is probable cause to believe the phone is an instrumentality of the offenses described herein. There is also probable cause to believe that the location information described in Attachment B will assist law enforcement in arresting JEREMY BROWN, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

5.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. §

2711(3)(A)(i). The acts in furtherance of the offenses under investigation occurred within Washington, DC. *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### *Background*

1.     The US Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 on January 6, 2021.

### *The 2020 United States Presidential Election and the Official Proceeding on January 6, 2021*

2.     The 2020 United States Presidential Election occurred on November 3, 2020.

3.     The United States Electoral College is a group required by the Constitution to form every four years for the sole purpose of electing the president and vice president, with each state appointing its own electors in a number equal to the size of that state's Congressional delegation.

4.     On December 14, 2020, the presidential electors of the U.S. Electoral College met in the state capital of each state and in the District of Columbia and formalized the result of the 2020 U.S. Presidential Election: Joseph R. Biden Jr. and Kamala D. Harris were declared to have won sufficient votes to be elected the next president and vice president of the United States.

5.     On or about December 19, 2020, President Donald J. Trump tweeted, "Statistically impossible to have lost the 2020 Election.  Big protest in D.C. on January 6th.  Be there, will be wild!"

6.     On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate ("the Joint Session") convened in the United States Capitol building

(the "Capitol" or the "U.S. Capitol") to certify the vote of the Electoral College of the 2020 U.S. Presidential Election (the "Certification").

### *Criminal Activity Before the Riot*

7.      Based on my knowledge, training, and experience, I know that participants in the kinds of criminal activities described herein tend to, and often did here, take certain preparatory steps before committing their crimes, including: researching and purchasing materials and supplies such as burner phones, tactical vests and helmets, and weapons including bear spray, pepper spray, asps (police batons), guns and ammunition, and zip tie restraints; mapping and reconnoitering the location of the planned crime and possible entry and escape routes, including checking for surveillance cameras and other potential security surrounding such locations; training in how to use their weapons and other tools and techniques involved in their planned criminal activity; and organizing with other co-conspirators on social media and elsewhere for planned travel and methods of attack.

8.      Beginning after the election in November 2020, text and other communications show that some groups of subjects planned and attended military-style training in preparation for opposing the results of the election.  Multiple groups that forcibly entered the Capitol appeared to consist of individuals who had coordinated their actions.  Some groups at the riot included members who dressed in similar uniforms with the same insignia, and members of some groups can be heard on video giving and following instructions.  Based on my training and experience, and this investigation, these groups' manner of dress, movements, and communication demonstrate that they had prepared together.  Furthermore, the movement of these groups within

the Capitol demonstrates an intent to, among other things, oppose by force Congress's authority, and to prevent, hinder, or delay the execution of the Joint Session's legal responsibilities.

9.      Beginning in December 2020, using social media, text messaging, and messaging applications, subjects planning to participate in the riot sent incendiary messages aimed at recruiting as large a following as possible to go to Washington, D.C. to interfere with the official Congressional proceeding on January 6, 2021.  This investigation has shown that many of the subjects of this investigation came from out of state and coordinated using social media, text messaging, and messaging applications on their cell phones.

10.      During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and helmets.  The common equipment and paraphernalia that groups inside and outside the Capitol possessed, such as bear spray, eye protection, tactical vests, and helmets, are evidence of some prior agreement among individuals to engage in the conduct described herein.

### *The Riot at the U.S. Capitol on January 6, 2021*

11.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate

side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All this area was barricaded and off limits to the public on January 6, 2021.

12.     The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

13.     On January 6, 2021, the area of the U.S. Capitol grounds was established as a restricted area.  This restricted area consisted of both permanent and temporary security barriers as well as posts manned by USCP to include bike racks.  The restricted area was bounded to the north of the U.S. Capitol along Constitution Avenue; to the south of the U.S. Capitol along Independence Avenue; to the west of the U.S. Capitol along the eastern side of First Street; and, on the east side of the U.S. Capitol, between the East Front and the grassy areas located between the Plaza and First Street.  Within the grassy area, a designated area for media was restricted by bike racks. This bounded area is hereinafter referred to as the "Restricted Grounds."  People could lawfully be on the Capitol grounds outside of the Restricted Grounds including on the East Front, east of the bike racks along the Capitol Plaza, including all of the grassy areas on the East Front.

14.     Within the West Front of the Restricted Grounds were additional temporary barriers due to preparations and ongoing construction for the Presidential Inauguration including perforated green plastic sheeting attached to stakes at regular intervals, known as snow fencing, and signage

stating "Area Closed by order of the United States Capitol Police Board." The exterior plaza of the U.S. Capitol was also closed to members of the public.

15.     A map of the area of the U.S. Capitol showing the Restricted Grounds is below, the red line marks the police line at the edges of the Restricted Grounds:



Figure 2: Restricted Grounds around the U.S. Capitol on January 6, 2021.

16.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which

8

took place on November 3, 2020. The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST). Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

17.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

18.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

19.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.

20.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence." I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

21.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior

to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

22. Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



23. Multiple groups that forcibly entered the Capitol appeared to consist of individuals who had practiced and/or coordinated their actions. For example, some groups included members who dressed in similar uniforms with the same insignia, and members of some groups can be heard

on video giving and following instructions.  Based on my training and experience, and this investigation, these groups' manner of dress, movements, and communication demonstrate that they had prepared together.  In addition, the equipment and paraphernalia that groups inside and outside the Capitol possessed, such as bear spray, eye protection, and helmets, are evidence of some prior agreement among individuals to engage in the conduct described herein.  Finally, the movement of these groups within the Capitol demonstrates an intent to, among other things, oppose by force Congress's authority and to prevent, hinder, or delay the execution of the Joint Session's legal responsibilities

24.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement was forced to draw their weapons to protect the victims sheltering inside.

25.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the federal police officers were injured and several were admitted to the hospital.

26.     The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers.  They also took police equipment from overrun police including shields and

police batons and used them against law enforcement officers trying to protect the U.S. Capitol and the people who were legitimately inside it. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

27. Also, at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

28. At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

29. At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video on the news media website of The New Yorker shows an individual

asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



30.    After subjects forced entry into the Senate Chamber, the same publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments

and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



31.     A subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter on the same video, stated, "Its Only A Matter of Time Justice is Coming."



32.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

33.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

34.     At around 4:52 p.m. EST, at a staging area for the media set up outside of the U.S. Capitol building on the east side, unknown subjects assaulted members of the media and stole and destroyed equipment owned by various members of the media and media companies.

35.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

36.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at

15

approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

37.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

38.     Beginning around 9:00 p.m., the House resumed work on the Certification.

39.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

### *Cell Phone Usage at the Riot*

40.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there. Subjects also posted comments, pictures, and video before, during, and after breaching the Capitol grounds and the Capitol building.

41.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to coordinate with other participants at the gatherings, to communicate with other individuals about the gatherings, to allow individuals to capture photographs and video footage of the gatherings, and to post on social media and digital forums about the gatherings. Nearly every phone is internet equipped and allows individuals to access the internet, including Google.

42.     Many subjects, including those detailed below, seen on news footage in the area of the U.S. Capitol were using a cell phone in some capacity. Based on my participation in this investigation, I know some subjects were recording the events occurring in and around the U.S.

Capitol and others took photos, to include photos and video of themselves after breaking into the U.S. Capitol itself. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

43. Photos available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot. In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos.

44. In addition, organized groups within the rioters used social media, text messaging, and messaging applications and other apps on their cell phones to plan and coordinate their activities before, during, and after the riot. As described further below, Oath Keepers and individuals associated with the Oath Keepers engaged in substantial use of internet connected cellular devices during the riots of January 6, 2021.

### *Criminal Activity After the Riot*

45. Following the riot, many subjects posted pictures, video, and texts showing and describing their participation in the riot. These included selfies and videos apparently taken with their personal cell phones. Many of these posts were subsequently deleted. I know from my knowledge, training, and experience that people who commit criminal acts will often delete such

information in an attempt to thwart any subsequent criminal investigation. Some subjects subsequently fled their homes and went into hiding.

### Facts Specific to This Application

### The Oath Keepers Militia

46.    Law enforcement and news-media organizations observed that members of an organization known as the Oath Keepers were among the individuals and groups who forcibly entered the Capitol on January 6, 2021. The Oath Keepers are a large but loosely organized collection of individuals, some of whom are associated with militias. Some members of the Oath Keepers believe that the federal government has been coopted by a cabal of elites actively trying to strip American citizens of their rights. Though the Oath Keepers will accept anyone as members, they explicitly focus on recruiting current and former military, law enforcement, and first-responder personnel. The organization's name alludes to the oath sworn by members of the military and police to defend the Constitution "from all enemies, foreign and domestic." The Oath Keepers are led by PERSON ONE.

47.    In a widely disseminated video[2] recorded by a photojournalist on January 6, 2021, a "stack" of individuals dressed in matching uniforms consisting of camouflaged-combat attire, to include confirmed Oath Keeper members (further described below), moves up and through a

---

[2] See https://apnews.com/article/ex-military-cops-us-capitol-riot-a1cb17201dfddc98291edead5badc257/gallery/0ecd1781c66d437f92c61b3f4848a74e

18

crowd on the east side of the U.S. Capitol. A screenshot of the video is below, with a portion of the "stack" encircled by a red oval:



48. Law enforcement reports that a stack or line formation is a tactical formation used by infantryman in the military. One defining feature of this formation is that members keep their hands on the backs or vests of the person in front of them to remain together while entering a room or weaving through a crowd. The purpose of maintaining direct physical contact with one another is to efficiently communicate with one another, especially in crowded or noisy areas.

49. A service called "News2Share" uploaded to YouTube a video of the January 6, 2021, attack at the Capitol. At the approximate 3-minute-and-8-second mark, the video shows eight-to-ten individuals in matching uniforms consisting of camouflaged-combat attire

aggressively approaching an entrance to the Capitol.[3]  These individuals, who are wearing helmets,

reinforced vests, and clothing with Oath Keeper logos and insignia, can be seen moving in an

---

[3] See https://www.youtube.com/watch?v=b76KfHB0QO8&feature=youtu.be.

organized and practiced fashion and forcing their way to the front of the crowd gathered around a set of doors to the Capitol.



50.  A close-up view of the badges on the vest of one of these individuals, seen just under the Oath Keepers emblem on his shirt, displays the Oath Keepers motto, "Not On Our Watch."  The badge also says, "I don't believe in anything.  I'm just here for the violence."



51.  Based on the foregoing observations of the video, and information gained in the course of the investigation, it is reasonable to believe that the organized group of individuals marching to the doors of the Capitol in the video above are members and affiliates of the Oath Keepers. More than a dozen Oath Keepers, including Jessica Watkins, Kelly Meggs, and

21

approximately eight individuals from Florida (including Defendant Four as referenced below), have been charged for their involvement in the January 6 riots.

<b>Facts Specific to Jeremy Brown</b>

52.     On January 25, 2021, FBI WFO received a complaint from Witness 1 who has known JEREMY BROWN for multiple years. Witness 1 provided publicly available photos of BROWN in tactical gear from January 5, 2021, but was unsure about whether BROWN entered the Capitol during the riots. Your affiant has provided one of the photos here:



A man who said he was an Oath Keeper attends a Washington, D.C., protest over the 2020 election results on Jan. 5. (Shannon Stapleton/Reuters)

53.     Your affiant was able to identify BROWN'S whereabouts on January 6 by comparing the publicly available photo of Brown (above) from January 5th to photography and video from January 6. Your affiant located a publicly available photo of him on Twitter wearing the same distinctive attire standing just before the steps of the East side steps of the Capitol during the riots of January 6. He was more than 100 feet within the restricted grounds that law enforcement had originally set up to protect Congress and Vice President Pence during the certification of the Electoral College vote. Brown wore full military gear, including a helmet, radio,

a tactical vest, and prominently displayed large surgical trauma shears tucked into a pack sitting

on the vest, nearly the exact attire that he wore on the prior day. Your affiant has provided the

photo below:



54.     Your affiant reviewed body worn camera footage from January 6, 2021 and was

able to identify BROWN by his distinctive attire outside the East doors of the Capitol at

approximately 4:27 PM. During this period, Brown remained at least one hundred feet past the

barriers that law enforcement had initially set up to protect the Capitol. On the body worn camera

video, BROWN carried zip ties attached to his belt, as well as a radio, surgical trauma shears, and

tactical gear. Metropolitan Police Officers, in attempting to resecure the Capitol Grounds,

advanced in a line and yelled "Back" in unison. Instead of voluntarily complying with police orders, BROWN only retreated when pushed with police baton sticks. During this encounter, BROWN repeatedly claimed that the officers were, in his opinion, violating the laws and the Constitution of the United States. Your affiant has included a screenshot below:



55.    In the course of this investigation, your affiant has also reviewed a statement from Defendant 4 who has pled guilty to Conspiracy to Obstruct an Official Proceeding relating to his conduct and the conduct of other Oath Keepers in breaching the US Capitol on January 6, 2021.

56.    According to Defendant 4, Defendant 4 utilized a ride share to travel to BROWN'S house on January 4 in preparation for traveling to Washington D.C. Your affiant has obtained records from the ride share company indicating that Defendant 4 entered an address consistent with BROWN's home address of ███████████████████████████

57.    According to Defendant 4, Brown and other individuals associated with the Oath Keepers coordinated their activity via a Signal[4] chat of Florida Oath Keepers. They caravanned in

---

[4] Signal is an encrypted chat application.

a recreational vehicle (RV) that was, according to Defendant 4, loaded with a cache of weapons, ammunition, and gas. Defendant 4 followed the RV in BROWN'S girlfriend's van. Kelly Meggs, currently indicted for his role in the conspiracy and the leader of the Florida branch of the Oath Keepers, informed Defendant 4 that Brown was a "loose cannon" and had explosives inside the RV. Defendant 4 positively identified Brown in the publicly available Twitter photo referenced above.

58.     Your affiant has reviewed the Signal chat referenced by Defendant 4. In the chat, BROWN coordinated travel plans with other Oath Keepers and rendezvous points. On December 23, 2020, he messaged, "We have a RV an Van going. Plenty of Gun Ports left to fill. We can pick you up." On January 1, 2021, BROWN, referring to his RV as "GROUND FORCE ONE" wrote:

> GROUND FORCE ONE Departure Plan:
> If you can, come to my house anytime Saturday. You can stop by and drop stuff off, or stay the night. This way we can load plan, route plan, and conduct PCIs (Pre Combat Inspections).
> I would LIKE to depart by 0645 on Sunday morning, Jan 3rd. Push through to the NC linkup on the 3rd, RON (Rest Over Night) there, then push to DC on the 4th. This will give us the 4th/5th to set up, conduct route recons, CTR (Close Target Reconnaissance) and any link ups needed with DC elements.
> If you need to be picked up, then we will work that into route plan and will provide exact pickup time by Saturday evening. Please have EVERYTHING ready once we arrive. It will be an ERO (Engine Running Onload).
> IF YOU ARE RIDING WITH ME, dm me with your plan to come here or be picked up. I will send address via the dm.
> I am willing to make adjustments all the way up until we pass your ass headed north, but it is now time to shit or get on someone else's pot. READY? GO!!!

59.     Your affiant has also reviewed statements made by BROWN and other Oath Keepers following the riots of January 6, 2021. On that day, BROWN wrote:

> Everything you are watching on the Media and Houses of Congress is a LIE! I was shot in the neck with pepper balls and beating in the forearm with a night stick

trying to shield unprotected Civilians from being hit in the head. This was an exercise in the unrestrained addiction to power.

Other indicted Oath Keepers also participated on additional Signal chats with BROWN. On the afternoon of January 7, 2021, Jessica Watkins, who has been indicted on charges of Conspiracy and Obstruction of an Official Proceeding for her actions on January 6, "Proud to go in with you all! I'd say 'I'll follow you into the gates of hell' but we did that already." Law enforcement has been able to retrieve portions, but not all of this chat from the phones of other conspirators. Some messages in the chat appear to have been deleted including those sent by Kelly Meggs, who, like Watkins, has also been indicted for Conspiracy and various charges with other Oath Keepers.

60. Your affiant also has reviewed Parler posts from BROWN'S account (@brownforcongress2020). Based on this review, your affiant was able to confirm that BROWN

intended to travel to DC for the January 5 protests in an RV with other individuals:



61.     Your affiant also reviewed publicly available video podcasts of BROWN and PERSON ONE. In an interview posted on July 12, 2021,[5] BROWN stated that he was present with other Oath Keepers on January 6. Prior to the riots, he deposited his guns with other Oath Keepers in Virginia and retrieved them after the riots. During the riots, BROWN stated that he was present with other Oath Keepers, including those who have been indicted for actions relating to their

---

[5] https://freeworldnews.tv/watch?id=60ecff8474feb85ab1adec2f

breach of the Capitol, and encouraged other Oath Keepers, such as Jessica Watkins, not to enter the Capitol.

62.     Your affiant has reviewed a statement given by BROWN to federal agents. Law enforcement agents called BROWN at XXX-XXX-4564 on or about January 6 and 7, 2021 and inquired regarding his whereabouts. Agents spoke briefly with BROWN on January 6, 2021 but could not hear him well due to apparent crowd noise. BROWN spoke to agents in more detail on January 7, 2021. He told them that he was present in Washington, D.C. and provided security for VIPs at the "Stop the Steal" rally. He stated that he had no information about anyone who entered the Capitol.

63.     According to records obtained through a search warrant which was served on Verizon, on January 6, 2021, in and around the time of the incident, the cellphone associated with XXX-XXX-4564 was identified as having utilized a cell site consistent with providing service to a geographic area that included the interior of the United States Capitol building. Your affiant has not yet identified BROWN inside the Capitol, but has identified him within the restricted ground.

64.     Your affiant has learned from an individual who has known BROWN for multiple years that he intends to sell his current house and vacate the premises by approximately October 2, 2021. According to publicly available information on Zillow, a real estate website, BROWN'S residence is currently for sale. On a photo from what appears to be BROWN'S office, your affiant identified a large white board containing lists of items corresponding to the following column: "Food," "Clothing," "Shelter," "Currency," "Communicate," "Move," and "Shoot." In the "Shoot" column, there are numerous firearms listed and explosive devices such as "flash bangs." "Flash bangs" are prohibited explosive devices under 26 USC 5861, unless registered with the Bureau of

Alcohol, Tobacco, and Firearms (ATF). Your affiant has queried information with the ATF. BROWN is not registered to possess explosive devices.

65.     At the bottom of the white board, "Good" is written in red marker, "Better" is written in blue marker, "Best" is written in green marker, "On hand" is written in black marker. All items listed under "Shoot," including flash bangs, are written in black marker indicating that they are on hand. Your affiant has included a zoomed in screen shot of the photo below and has circled flash bangs in red:



66.     Your affiant has spoken to an individual who has known BROWN for multiple years. This individual did not have any specific knowledge about BROWN possessing or seeking to possess explosives such as "flash bangs." BROWN is currently living both in the RV and in the

house. The RV is the same RV he used to travel to Washington, D.C. The RV is parked in front of his house. FBI agents observed the RV on September 21, 2021 and photographed it below:



67. Both the RV and trailer are registered to ▮▮▮▮▮▮▮▮▮▮, who according to multiple individuals who have known BROWN for multiple years, is BROWN'S current girlfriend. On her driver's license, ▮▮▮▮▮ lists her home address as of ▮▮ ▮▮ ▮▮▮▮▮▮, ▮▮▮▮▮▮. BROWN resides with ▮▮▮▮▮▮▮▮▮▮▮▮.



68. A family member of Witness 1 informed Witness 1 that IT was present inside ▮▮ ▮▮▮▮▮▮ prior to the house going on the market. The house was full of BROWN'S possessions with multiple boxes and weapons scattered throughout the house. Publicly available photos on Zillow now show an organized home, inconsistent with the description of the house by



the family member of Witness 1. Witness 1 stated that BROWN now alternates sleeping in the house and in the RV.

69.     Based on my training, experience, general familiarity with the small confines of an RV, the fact that the trailer was purchased approximately one month ago and sits next to the RV and the house within the property line of ███ ██ ██████████, and that it is unlikely that an individual would market a home available for public inspection with guns and explosives inside of the home, it is probable that many of BROWN'S possessions, including electronics, guns, ammunition, and explosives, which constitute potential evidence in the investigation, have been moved to the RV or trailer.

### Cellular Devices

70.     There is probable cause to believe that BROWN'S cellular telephone and other electronic devices contain evidence of the criminal conduct under investigation.  Because BROWN traveled to Washington, D.C., from Florida, there is also probable cause to believe that BROWN would have used any cellular telephone in his possession to communicate with others during his trip about his activities in Washington, D.C., navigate during travel, conduct searches for food and lodging, and for other purposes that would serve as evidence of his whereabouts and activities at various points during his trip.   All of this type of electronically-stored evidence will help investigators prove BROWN'S presence and activities at the U.S. Capitol on January 6, 2021, his intent when traveling to Washington, D.C., and the identities of his coconspirators.

71.     It is well-known that virtually all adults in the United States use mobile digital devices like cellular telephones.  In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that that same 2019 report estimated that 81% of Americans use at least one smartphone.  *See*

Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile. Given cellular telephones' ubiquity, portable size, and ability to store uniquely personal information, your affiant knows that cellular telephone users generally keep his cellular telephone on or near himself.

## *Facts Specific to This Seizure of the TARGET PHONE*

72.     On or about September 30, 2021, your affiant anticipates arresting BROWN for violations of federal law. Due to officer safety considerations, your affiant and other federal agents anticipate arresting BROWN when he is away from his suspected cache of weapons and explosives that BROWN likely keeps at his house, RV, or trailer. In the last week, agents have observed BROWN leave his property. Based on my training and experience, your affiant knows that individuals typically carry their cell phones when they exit their property. During the arrest of BROWN, your affiant will identify the TARGET PHONE from BROWN's person, immediate vicinity, or his vehicle by calling or pinging the TARGET PHONE. Obtaining active real time information about the location of the TARGET PHONE will aid your affiant in both arresting BROWN and in seizing the device.

## **BACKGROUND ON CELL-SITE DATA AND LOCATION INFORMATION**

73.     In my training and experience, I have learned that PROVIDER is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or "cell tower/sector records."   E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several

of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

74. Based on my training and experience, I know that PROVIDER can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on PROVIDER's network or with such other reference points as may be reasonably available.

75. Based on my training and experience, I know that PROVIDER can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as PROVIDER typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

76. Based on my training and experience, I know that Verizon also collects per-call measurement data ("PCMD"), also referred to as timing advance or Verizon's "TrueCall" report. Timing advance information estimates the approximate distance of the cellular device from a

cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

77.     Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

78.     Based on my training and experience, I know that wireless providers such as PROVIDER typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.  I also know that wireless providers such as PROVIDER typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes

under investigation because the information can be used to identify the TARGET PHONE NUMBER's user or users.

## AUTHORIZATION REQUEST

79.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

80.     The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A-1 for each communication to or from the TARGET PHONE NUMBER, without geographic limit, for a period of thirty (30) days pursuant to 18 U.S.C. § 3123(c)(1).

81.     I further request that the Court direct PROVIDER to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  I also request that the Court direct PROVIDER to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information unobtrusively and with a minimum of interference with PROVIDER's services, including by initiating a signal to determine the location of the Target Telephone on PROVIDER's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate PROVIDER for reasonable expenses incurred in furnishing such facilities or assistance.

82.     Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, good cause exists under Rule 41 to permit the execution of the requested warrant at any time in the day or night.  Further, pursuant to 18 U.S.C.

§ 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## **CONCLUSION**

83.     I submit that this affidavit supports probable cause for a warrant to collect the requested information about the location of the Target Telephone, as described in Attachment A, and to seize the evidence described in Attachment B.

Respectfully submitted,

KATIE HILL
SPECIAL AGENT
FBI

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on September 29, 2021.

Zia M. Faruqui
2021.09.29
19:42:22 -04'00'

ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

**Attorney Certification Under 18 U.S.C. §§ 3121-3127**

To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant applied for herein will also function as a pen register order. I, an attorney for the Government, certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by FBI. *See* 18 U.S.C. §§ 3122(b), 3123(b).

_____/s/_ Louis Manzo_____
Louis Manzo
Special Assistant United States Attorney
District of Columbia

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Verizon, and my title is

_____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Verizon.  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.	all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Verizon, and they were made by Verizon as a regular practice; and

b.	such records were generated by Verizon's electronic process or system that produces an accurate result, to wit:

1.	the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Verizon, in a manner to ensure that they are true duplicates of the original records; and

2.	the process or system is regularly verified by Verizon, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____    _____
Date                                Signature